IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MPOWER, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CIV-20-1183-SLP |
| ) | |
| PHILADELPHIA INDEMNITY ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

**O R D E R**

Before the Court is Defendant Philadelphia Indemnity Insurance Company's Motion for Partial Summary Judgment [Doc. No. 49]. Plaintiff has filed a Response [Doc. No. 62] and Defendant has filed a Reply [Doc. No. 80].[1] The matter is fully briefed and ready for decision.

**I.    Introduction**

Plaintiff, MPower, Inc. is a nonprofit agency located in a former elementary school in Stillwater, Oklahoma. Plaintiff had a commercial property insurance policy with Defendant, Philadelphia Indemnity Insurance Company, when a hailstorm occurred in May of 2019. This lawsuit arises from a dispute regarding coverage and the scope of damage associated with that May 2019 storm. Defendant issued payment for covered damage to one portion of the roof and other roof items, but denied coverage for other portions of the roof and for interior damage from water leaks.

---

[1] Citations to the parties' submissions reference the Court's ECF pagination.

Plaintiff contends that Defendant breached the terms of the policy and its duty of good faith and fair dealing by failing to pay for covered damage to additional portions of the roof. In support of its bad faith claim, Plaintiff asserts Defendant ignored evidence which would support coverage, engaged in an outcome-oriented investigation, and delayed its decision on the claim to Plaintiff's detriment.

Defendant moves for summary judgment on Plaintiff's bad faith claim, asserting there is a legitimate dispute as to coverage regarding interior damage and the portions of the roof for which it denied payment. Defendant further asserts there is no evidence of malice or reckless conduct sufficient to warrant imposition of punitive damages. Plaintiff's breach of contract claim is not at issue in the present Motion.

## II. Governing Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether summary judgment is proper, the court does not weigh the evidence and determine the truth of the matter asserted, but determines only whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015). An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id.* In reviewing a motion for summary judgment, the Court views "the facts and all reasonable inferences those facts support, in

the light most favorable to the nonmoving party." *iMatter Utah v. Njord*, 774 F.3d 1258, 1262 (10th Cir. 2014) (citation omitted).

### III.   Undisputed Material Facts[2]

Defendant issued an insurance policy to Plaintiff (the "Policy"), affording commercial property coverage for a former school building owned by Plaintiff in Stillwater, Oklahoma (the "Property"). *See* Policy [Doc. No. 49–1]. The Policy was in effect from May 1, 2019 through May 1, 2020, and it only covered loss or damage to the Property which commenced during that time period. *Id*. at 10, 98. In pertinent part, the Policy excluded coverage for damage to the Property resulting from wear and tear, deterioration, latent defect, any quality of the property which causes it to damage or destroy itself, and continuous or repeated leakage of water that occurs over a period of 14 days or more. *Id*. at 102–104.

Plaintiff's Property had several different kinds of roof coverings, including thermoplastic membrane ("TPO"), modified bitumen roofing, gravel ballasted built-up asphalt roofing ("gravel ballast"), and metal roofing. *See* Engineering Inspection Report [Doc. No. 49–10] at 28. Here, the dispute centers on the modified bitumen roofing and the interior damage for which Defendant denied coverage. *See* Resp. [Doc. No. 62] at 24-30, 33-37; Reply [Doc. No. 80] at 2-10.[3]

---

[2] Included here are those material facts supported by the record and not genuinely disputed in the manner required by Fed. R. Civ. P. 56(c).

[3] The evidence and briefing are unclear as to whether (or when) Plaintiff sought coverage for the gravel ballast or metal portions of the roof. Plaintiff's contractor, Cody Warner, submitted an estimate to Defendant on February 10, 2020 which included amounts for replacement of some

3

On October 1, 2019, Plaintiff reported a claim to Defendant for "hail damage to [the] roof [of the Property] causing leaks," with a reported date of loss of May 28, 2019. Loss Notice [Doc. No. 49–2].  According to Plaintiff's executive director, Amy Spiva, the water leaks started showing up in June of 2019, shortly after the May 28 storm.  Spiva Dep. [Doc. No. 62-1] at 62:4-13; 102:23–103:8.  Plaintiff had been making repairs attempting to fix the leaks, but it eventually realized the problem was bigger than the temporary repairs could fix.  *Id.* at 62:4-13, 64:12-19, 68:11-22.  Plaintiff hired Cody Warner with American Roofing and Construction to inspect the roof, and he told Plaintiff there was hail damage. *Id*. at 64:12-19.  When the claim was reported, Plaintiff told Defendant's adjuster the storm included golf ball sized hail and that the roof leaks had begun recently.  Claim Notes [Doc. 49-3] at 10.[4]

Defendant assigned the claim to Senior Claims Specialist Steven Maxwell, who then assigned the claim to independent adjuster Donna Geissler. *See* Claim Assignment [Doc. No. 49–6].  Ms. Geissler inspected the Property on October 8, 2019, along with Mr.

---

gravel ballast roofing, but no amounts were included for the metal roofing.  *See* Warner Estimate [Doc. No. 49–15] at 3–7, 14.  The estimate was accompanied by a letter which stated a commercial inspector found "hail damage on the modified sections that warrants replacement but not enough on the metal and tar and gravel roof sections." *Id*. at 14.  Plaintiff repeatedly refers to Mr. Warner's testimony that Plaintiff was not seeking coverage for the gravel ballast or metal portions of the roof at the time the estimate and letter were sent, although he maintains there was hail damage to those items.  *See* Resp. [Doc. No. 62] at 16, 19; Warner Dep. [Doc. No. 62–6] at 81:12–83:7, 95:13–96:21.

[4] Plaintiff's counsel are reminded to comply with Local Civil Rule 7.1(n) in future filings: "No response ... brief shall include an exhibit or attachment that is already included with the motion under consideration; reference shall instead be made to the exhibit or attachment to the motion under consideration, including the ECF Document Number."  *Compare* Defendant's Ex. 3 [Doc. 49–3]; *with* Plaintiff's Ex. 10 [Doc. No. 62–10].

Warner. *See* Reserve Report [Doc. No. 49–8] at 2. Ms. Geissler sent a Reserve Report to Defendant on October 9, 2019, which noted a disagreement with Mr. Warner: according to the Report, Mr. Warner thought all roof surfaces needed replacement, and Ms. Geissler disagreed with the assessment of hail damage and the age of some of the damage.[5] Reserve Report [Doc. No. 49–8] at 2. Ms. Geissler recommended that Defendant hire engineer for investigation of the damage. Reserve Report [Doc. No. 49–8] at 2.

Ms. Geissler sent an updated Report to Defendant on October 16, 2019, which stated Engineering, Inc. had been retained for the claim. *See* First Report [Doc. No. 49–9]. In that Report, Ms. Geissler noted that she observed hail impact damage to the TPO portion of the roof during her inspection, and that pressure on the TPO membrane allowed water to rise through. First Report [Doc. No. 49–9] at 3. Ms. Geissler also noted her opinion that there was no hail damage to the other roof systems such as the modified bitumen roofing. *See id*; *see also* Eighth IA Report [Doc. No. 49–17] at 12.[6]

---

[5] Plaintiff contends the disagreement noted in Ms. Geissler's Report is inconsistent with her comments at the inspection, where she did acknowledge hail damage to the roof. Resp. [Doc. No. 62] at 15-17. According to Mr. Warner, Ms. Geissler generally agreed there was hail damage at the inspection, although he does not recall discussing hail damage to specific portions of the roof. Warner Dep. [Doc. No. 62–6] at 75:6–20, 79:7-13. Her Report notes a general disagreement as to hail damage (again, without specifying where). Reserve Report [Doc. No. 49–8] at 2. Although there could be general inconsistency between Ms. Geissler's Report and her comments at the inspection, that inconsistency is immaterial because it does not relate to the specific roof components at issue.

[6] Ms. Geissler's Report also stated that Mr. Warner agreed the gravel ballasted roof systems sustained no hail damage. *Id*. at 3. By contrast, Mr. Warner testified he *did* believe there was hail damage to that system, but that Plaintiff was not seeking payment for that portion of the roof at the time. Warner Dep. [Doc. No. 62–6] at 81:12–83:7, 95:13–96:21. Viewing the evidence in the light most favorable to Plaintiff, it does appear Ms. Geissler's Report misstates Mr. Warner's opinion as to the gravel ballasted roof system.

Engineer Robert Chynoweth inspected the interior and exterior portions of the Property on October 30 and 31, 2019 and provided a Report discussing his findings on November 28, 2019. Inspection Report [Doc. No. 49–10]. Mr. Chynoweth's Report included pictures of hail–shaped marks which were roughly the size of the head of a pen and stated that the recent hail within the least year at the Property location was less than "3/4–inch" in size based on "typical hail-sizing indicators observed during [the] inspection[.]" *Id*. at 19-21, 44. Mr. Chynoweth concluded there was no recent hail damage to exterior elements of the building (including brick veneer, windows, window casings, and metal infill panels below the windows), and no hail damage to the gravel ballasted roof system, modified bitumen roofing, or the metal roof panels. *Id*. at 46. Mr. Chynoweth did, however, find hail damage to the TPO roof membrane which "likely occurred during past storms as well as the hailstorm on May 13, 2019," and therefore recommended removal and replacement of that portion of the roof. *Id*.

As to the interior portions of the Property, Mr. Chynoweth noted it was raining when he inspected the interior on October 30, 2019 and had been the day before as well. *Id*. at 6. During the inspection, Mr. Chynoweth observed leaks throughout all portions of the Property except the gymnasium. *Id*. Mr. Chynoweth inspected the roof coverings above the areas of water intrusion and determined none of those roof coverings showed storm related damage, except for the TPO roof membrane over the east classroom building. *Id*. at 6, 46. Mr. Chynoweth also inspected the areas above the ceiling tiles showing water damage and concluded the roof leaks were occurring at or near roof penetrations and showed signs of long-term water intrusion. *Id*. at 6, 46. Mr. Chynoweth provided a Water

Intrusion Table describing the water leaks by room and the potential cause of the water intrusion—none of which, in his opinion, was caused by the storm. *See id*. at 46–48.

Between Mr. Chynoweth's inspection and date of his Report, Ms. Spiva provided Mr. Chynoweth receipts for recent repairs and told him more leaks began to appear. *See* Spiva Email, 11/01/19 [Doc. No. 62-17]. Ms. Spiva followed up with Mr. Chynoweth regarding the status of the report but did not receive a response. Spiva Email, 11/13/19 [Doc. No. 62–19]. Ms. Spiva also contacted Plaintiff's insurance agent and expressed concern about when she might receive a response from Defendant, stating Plaintiff held off on repairs awaiting an answer, but that the damage continued to occur. Spiva Email, 12/4/2019 [Doc. No. 62–23].

Mr. Maxwell reviewed the reports from Ms. Geissler and Mr. Chynoweth on December 13, 2019. Claim Notes [Doc. No. 49–3] at 8. On December 19, 2019, Defendant sent a letter and an estimate to Plaintiff advising it would be issuing a net payment of $79,524.78. December 19, 2019 Letter [Doc. No. 49–13]. The estimate included payment for removal and replacement of the TPO roof, flashing, insulation, combing the coils on the rooftop HVAC units, and to replace vent caps, ventilators, cap flashings, and the metal entry awning. *Id*. at 4–8. Defendant issued payment to Plaintiff the next day. Claim Notes [Doc. No. 49–3] at 6.

On February 3, 2020, Defendant sent a partial denial letter to Plaintiff which denied coverage for the remaining roofing and interior damage. February 3, 2020 Letter [Doc. No. 41–14]. The letter stated Defendant's position that the remaining portions of the roof did not exhibit evidence of hail damage and the Policy excluded coverage for: (1) wear and

7

tear; (2) deterioration; (3) faulty, inadequate, or defective design, workmanship, repair, construction, or materials used in repair or maintenance; and (4) continuous or repeated seepage or leakage of water that occurs over a period of fourteen (14) days or more. *Id*. at 2–3.

Shortly after the February 3 denial letter, Mr. Warner sent a letter to Mr. Maxwell on behalf of Plaintiff with photographs, a hail report, and an estimate, challenging the conclusion that there was hail damage to certain portions of the roof but not others. *See* February 10, 2020 Letter [Doc. No. 49–15]. The letter states that Mr. Warner walked the roof with Ms. Geissler, and she agreed there was hail damage. *See id*. The letter further states Plaintiff hired a certified commercial inspector for another opinion, and "[h]e agreed that there was hail damage on the modified sections that warrants replacement but not enough on the metal and tar and gravel roof sections." *Id*.[7]

On March 5, 2020, Mr. Chynoweth, Ms. Geissler, and Mr. Warner met at the Property and took two samples from the modified bitumen portion of the roof to send for laboratory testing. Seventh IA Report [Doc. No. 49–16] at 2. When the two samples were gathered, Mr. Warner offered to take additional samples of other areas on the roof, but Mr. Chynoweth and Ms. Geissler declined.[8] Warner Dep. [Doc. No. 62–6] at 90:21–92:14.

---

[7] As explained in note 3, supra, Mr. Warner later testified he believed there was hail damage to the gravel ballast or metal roof systems, but his letter did not seek payment for those systems because he wanted to take the least time–consuming approach. *See* Warner Dep. [Doc. No. 62–6] at 95:13–96:21.

[8] Mr. Chynoweth testified that it is "very likely" more hail hits would have been found if additional samples were taken. Chynoweth Dep. [Doc. 62–13] at 175:22–176:10.

Mr. Chynoweth sent an email to Crenshaw Consulting Group ("Crenshaw") asking Crenshaw if they could determine: (1) whether the modified bitumen sample showed hail damage as opposed to age related cracking; and (2) whether the damage occurred within the last year. Chynoweth Email [Doc. No. 62–29].

Mr. Chynoweth sent the samples to Crenshaw, and Defendant received Crenshaw's Report along with a Supplemental Report from Mr. Chynoweth more than two months later, on May 11, 2020.[9] Eighth IA Report [Doc. No. 49–17] at 1–34. The Crenshaw Report concluded that the first sample showed damage to the modified bitumen roofing consistent with an impact between 2–2.5 inches, and the sample failed a water column test. *See id*. at 12. The second sample showed an impact between 1–1.25 inches, but it did not leak. *Id*. The Crenshaw Report did not provide an opinion as to the date of the damage. *See generally id*.

Mr. Chynoweth's Supplemental Report acknowledged the "punctures detected in both samples [of modified bitumen] were caused by impacts from falling objects, such as hail." *Id*. at 4. The Supplemental Report proceeded to analyze weather data in comparison to those samples, which showed a prior hailstorm in 2009 ranging 1.3–1.4 inches in size and another in 2015 with 2-inch hail. *Id*. at 5. Based on that weather data and observations from his initial inspection, Mr. Chynoweth concluded the hail detected in the Crenshaw Report was consistent with larger hail that "likely occurred in March 2015 or June 2009"

---

[9] Mr. Warner followed up with Ms. Geissler in April 2020 requesting an update, and Ms. Geissler responded that there had been no progress due to COVID-19. April 9 Emails [Doc. No. 62–31].

rather than the hail on May 28, 2019, which he believed was "less than 3/4 inch." *Id*. at 4–5.[10]

Although Defendant received the Supplemental Report on May 11, 2020, it did not follow up with Plaintiff until more than two months later, on July 20, 2020. *See* Eighth IA Report [Doc. No. 49–17]; *see also* Claim Notes [Doc. No. 49–3] at 2-4. Between May 11 and July 20, Ms. Spiva followed up multiple times regarding the claim, as did Plaintiff's insurance broker, Duane Murray, and Ms. Geissler. Spiva Email, 5/20/20 [Doc. No. 62–37]; Murray Email, 6/19/20 [Doc. No. 62–39]; Geissler Claim Notes [Doc. 62–42] at 2; Murray Email, 7/1/20 [Doc. No 62–43]. During this time, water continued to leak into the interior of the Property. Spiva Email, 6/19/20 [Doc. No. 62–46].

Defendant reviewed Mr. Chynoweth's Supplemental Report on June 19, 2020, and again on July 2, 2020. Claim Notes [Doc. 49–3] at 3–4. Based that Report, Defendant's adjuster concluded the hail damage detected by Crenshaw was "not within the period of time that the insured acquired the property but that it was during the previous owner's possession[,]" and that the interior water damage also occurred prior to the Policy's coverage. *Id*. Defendant also noted a potential underwriting issue regarding the type of

---

[10] The weather data discussed in the Supplemental Report is somewhat conflicting. The StormerSite data provided by Plaintiff's contractor showed hail sizes ranging from 1-inch to 2.5-inches within approximately 4–8 miles from the Property on May 28, 2019. *Id*. at 4. By contrast, weather data previously obtained from CoreLogic Spatial Solutions, LLC ("CoreLogic") and the National Weather Service ("NWS") indicated the hail at Plaintiff's location on May 28 was "less than 3/4-inch." *Id*. at 5. However, Mr. Chynoweth also noted CoreLogic "suggests 1.4-inch hail may have occurred on May 13, 2019," while NWS and StormerSite found 1-inch hail within 5.5 miles of the Property on that date. *Id*. Finally, the Report noted weather data from all three sources showing 2-inch hail in March of 2015 just one mile east of the Property, and other data showing 1.3–1.4-inch hail in 2009 and 2010. *Id*.

coverage provided under the Policy: namely whether it provided replacement cost coverage (for which coinsurance would apply) or "functional" replacement cost coverage (for which coinsurance would not apply). *Id*. at 3.[11]

On July 20, 2020, Mr. Maxwell called Ms. Spiva and stated there was a coverage issue because Mr. Chynoweth concluded the larger hail detected by Crenshaw occurred in 2009. *See* Claim Notes [Doc. No. 49–3] at 2. Ms. Spiva expressed frustration because Defendant recently declined to renew Plaintiff's Policy, and she thought Defendant was "dropping the ball" on the claim due to the non–renewal. *See* Spiva Email, 7/20/20 [Doc. No. 62–45]. Ms. Spiva was also frustrated that Defendant first claimed there was no hail damage to certain portions of the roof, but then stated the hail damage was too large to have occurred in May of 2019. *Id*. Mr. Maxwell requested an inspection report from Plaintiff's purchase of the Property to help determine whether the damage occurred prior to coverage, and Ms. Spiva said she would try to obtain it. *See id*.; *see also* Claim Notes, [Doc. No. 49–3] at 2.

After that conversation on July 20, Defendant did not follow up with Plaintiff again until it sent a denial letter on September 1, 2020. *See* Claim Notes [Doc. No. 49–3] at 1–2. During that time, Ms. Spiva and Plaintiff's insurance agent followed up with Defendant

---

[11] Claim notes indicate Defendant investigated the underwriting issue in July and August of 2020 and concluded Plaintiff's agent requested functional replacement cost coverage, but the policy was issued providing replacement cost coverage to which coinsurance would apply, and that version had been renewed twice. Claim Notes [Doc. No. 49–3] at 2. This issue is the subject of Plaintiffs' Motion for Leave to File Second Amended Complaint [Doc. No. 45], but it does not appear the underwriting issue is material to Plaintiff's bad faith claim because it did not affect the coverage decisions made or the extent of Defendant's investigation.

regarding the status of the claim. Spiva Email, 7/27/20 [Doc. No. 62–51]; Murray Email, 8/3/20 [Doc. No. 62–52]; Murray Email, 8/27/20 [Doc. No. 62–54]. During some portion of that time, Defendant's employees were investigating the underwriting issue regarding the type of coverage Plaintiff had (and whether coinsurance would apply). *See* Claim Notes [Doc. No. 49–3] at 1–2. Defendant did not follow up regarding the inspection report from Plaintiff's purchase of the Property, nor was that report provided at the time. *See id.*[12]

Ultimately, Defendant sent its denial letter on September 1, 2020, which reiterated its position regarding interior damage and stated its final position as to roof structures: although the hail damage to the TPO roofing and metal roofing occurred during the policy period, Defendant believed the hail damage to the modified bitumen roofing was not covered because it occurred prior to Plaintiff's ownership of the building. *See* Denial Letter [Doc. No. 49-18] at 8-9.

## IV. Discussion

### A. Bad Faith

In this diversity action, Oklahoma law governs.[13] Under Oklahoma law, "[a]n insurer has a non–delegable duty of good faith while performing the functions of claims management, adjustment and settlement." *Wathor v. Mut. Assur. Adm'rs, Inc.*, 87 P.3d

---

[12] Plaintiff's Response attaches the inspection report, which states, in pertinent part: "[t]he condition of the electrical, plumbing, roof, and HVAC units is unknown but assumed to be adequate/operational." [Doc. No. 62-58] at 4. Plaintiff contends (and Defendant does not dispute) that the modified bitumen roofing system was repaired with a coating in 2010 or 2011 after the 2009 hailstorm. *Compare* Resp. [Doc. No. 62] at 26; *with* Reply [Doc. No. 80] at 9.

[13] Both parties cite Oklahoma law in their summary judgment briefing. Accordingly, the Court applies Oklahoma law. *See Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293 (10th Cir. 2022) ("In a case based on federal diversity jurisdiction, the law of the forum state governs.").

559, 563 n.6 (Okla. 2004).  "This duty requires the insurer to take positive steps to adequately investigate, evaluate, and respond to its insureds' claims." *Id*. "An insurer may employ an agent or an independent contractor to perform these functions, but this does not absolve the insurer of its own non-delegable duty." *Id*. "An insurer's breach of this duty gives rise to a separate cause of action sounding in tort." *Id*. at 562.

"Tort liability arises only 'where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured.'" *Skinner v. John Deere Ins. Co.*, 998 P.2d 1219, 1223 (Okla. 2000) (quoting *Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 905 (Okla. 1977)). "[T]he minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence, but less than the reckless conduct necessary to sanction a punitive damage award[.]" *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1094 (Okla. 2005). A breach of the duty of good faith "may be shown without proving conduct on the part of the insurer that was intended to harm, injure or deceive its insured." *Id*. at 1093 n.6.

"Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious." *Garnett v. Gov't Emps. Ins. Co.*, 186 P.3d 935, 944 (Okla. 2008). "A jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct." *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993).

Further, the Oklahoma Supreme Court has recognized that there may be legitimate disagreements between insurer and insured "on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions," and "[r]esort to a judicial forum is not *per se* bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit." *Christian*, 577 P.2d at 905. When a legitimate dispute exists, "the inference of bad faith" is negated "as a 'matter of law.'" *Harris v. Progressive Direct Ins. Co.*, 740 F. App'x 900, 910 (10th Cir. 2018) (quoting *Oulds*, 6 F.3d at 1442). The "critical question" in this analysis "is whether the insurer had a 'good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding [or delaying] payment under the policy.'" *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 725 (Okla. 2009) (citations omitted).

Here, the dispute centers on coverage for hail damage to the modified bitumen portion of Plaintiff's roof and coverage for the interior leaks. Defendant argues there is a legitimate dispute as to whether the additional damage to the Property for which it denied payment occurred as a result of a hailstorm in May of 2019. *See* Mot. [Doc. No. 49] at 23–25. Defendant further asserts its denial of payment for the additional roofing and the interior damage is supported by the investigation and conclusions of its engineer, Mr. Chynoweth, and its adjuster, Ms. Geissler. *Id*. at 22–25.

However, the existence of a legitimate dispute does not, standing alone, negate a bad faith claim. Instead, "it shifts the burden to the insured to present additional evidence of bad faith." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006); *Watts v. Allstate Prop. & Cas.* Co., No. CIV-14-483-F, 2015 WL 13549198, at *4 (W.D. Okla. Apr.

14

9, 2015) ("By presenting evidence that casts doubt on the legitimacy of an insurer's good faith justification for disputing a claim, a plaintiff can defeat summary judgment and present his case to the jury." (citing *McCoy v. Oklahoma Farm Bur. Mut. Ins. Co.*, 841 P.2d 568 (Okla. 1992))).[14]

Plaintiff argues Defendant acted in bad faith denying its claim for damage to the interior of the Property and to the modified bitumen roofing because Defendant and its engineer engaged in an inadequate, outcome–oriented investigation and delayed the decision on the claim. Resp. [Doc. No. 62] at 9, 24–30, 33–37. Specifically, Plaintiff argues that Defendant: (1) failed to consider evidence of the Property's pre–loss condition; (2) ignored the timing of when the leaks began; (3) improperly investigated the source of the leaks; (4) failed to consider damage in the vicinity of the Property; (5) relied solely on weather data to deny Plaintiff's claim; and (6) delayed its decision on the claim by thirteen (13) months. *Id*. at 24–30, 33–37.

The Court finds, construing the evidence in the light most favorable to Plaintiff, that questions of fact exist with respect to the reasonableness of Defendant's investigation,

---

[14] "The additional evidence required for this showing may take several forms." *Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1315 (10th Cir. 2019). For example, a plaintiff may demonstrate bad faith by providing evidence that the insurer did not actually rely on the legitimate dispute to deny coverage, denied the claim for an illegitimate reason, or otherwise failed to treat the insured fairly. *Id*. (citations and quotation marks omitted). A plaintiff may also show bad faith by providing evidence that the insurer performed an inadequate investigation of the claim. *Id*. (citing *Oulds*, 6 F.3d at 1442). "'[W]hen a bad faith claim is premised on inadequate investigation, the [claimant] must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information' that would have delegitimized the insurer's dispute of the claim." *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1128 (10th Cir. 2012) (quoting *Timberlake Const. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 345 (10th Cir. 1995)).

evaluation, and response to Plaintiff's claim. *See Badillo*, 121 P.3d at 1093 ("[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact. . .").

Defendant originally maintained there was no hail damage to the modified bitumen portion of Plaintiff's roof. First Report [Doc. No. 49–9] at 3; Inspection Report [Doc. No. 49–10] at 46. However, the Crenshaw Report confirmed there was hail damage to the modified bitumen roofing, at which time Defendant changed its position and concluded that the damage was the result of a prior hailstorm, which would not be covered. Eighth IA Report [Doc. No. 49–17] at 4-5, 12. That conclusion was based on primarily on comparison of weather data to the specific hail sizes found by Crenshaw. *See id*. at 4-5. The weather data is conflicting across various sources (Plaintiff's data would appear to support coverage, while Defendant's would not), and all of Defendant's witnesses testified that the weather data it ultimately chose to rely on can be inaccurate.[15] Additionally, when the parties met to gather samples for testing, Defendant's adjuster and engineer declined to take more than two samples, despite later acknowledging more hail damage would have likely been found had they done so. Warner Dep. [Doc. No. 62–6] at 90:21–92:14; Chynoweth Dep. [Doc. 62–13] at 175:22–176:10.

---

[15] *See* note 10 and accompanying discussion, supra; *see also* Maxwell Dep. [Doc. No. 62-4] at 102:3-8; Geissler Dep. [Doc. No. 62-5] at 100:22-102:9; Chynoweth Dep. [Doc. No. 62-13] at 136:15-138:20.

With those circumstances in mind, differing conclusions may be drawn as to whether failure to consider evidence of the Property's pre–loss condition or damage to other nearby properties from the same storm renders Defendant's investigation inadequate or delegitimizes its dispute of the claim. Specifically, Plaintiff cites evidence (which Defendant does not dispute) that the modified bitumen roofing was repaired after the 2009 hailstorm, and a reasonable jury could conclude that this pre–loss evidence delegitimizes Defendant's conclusion that the 2009 storm caused the hail damage detected by Crenshaw.[16] Additionally, viewed in the light most favorable to Plaintiff, the evidence that the roofs replaced on two nearby properties after the same storm had the same materials as those on Plaintiff's Property could delegitimize the conclusion that the modified bitumen roofing was not damaged by hail in May of 2019. Warner Dep. [Doc. No. 62-6] at 27:20-25, 29:8-30:10, 64:14-25, 70:11-20.

Defendant's adjusters and engineer testified that consideration of the pre–loss condition and damage to properties in the vicinity is helpful to determine the cause or timing of damage,[17] but there is no evidence to suggest Defendant did so. Of course, failure to consider evidence of the pre-loss condition of the Property or damage to neighboring

---

[16] Defendant's Reply argues the fact "that the roof was repaired with a coating in 2009 only further confirms that the impacts under that coating were caused by the 2009 storm as Philadelphia determined." [Doc. No. 80] at 9. Defendant cites no evidence in support of its assertion that the hail damage detected by Crenshaw was found under the coating, and Mr. Warner's email states the contrary. *See* Warner Email [Doc. No. 62-50] at 1. There is also no evidence that Defendant considered the timing of the coating repairs in the first place.

[17] *See* Maxwell Dep. [Doc. No. 62-4] at 49:22-50:10, 98:18-25, 101:7-102:2; *see also* Geissler Dep. [Doc. No. 62-5] at 98:5-99:16; Chynoweth Dep. [Doc. No. 62-13] at 111:5-115:4, 140:1-6.

properties, without more, would not always be indicative of an inadequate investigation. But that evidence is particularly relevant in this case, where Defendant's denial was based on the conclusion that the hail damage found by Crenshaw occurred in a prior hailstorm, and some of the additional evidence could be found to disprove that conclusion.

There are also issues of material fact regarding the reasonableness of Defendant's investigation and conclusion as to the interior water leaks. There is no evidence that Defendant considered the timing of the water leaks—*i.e.*, Ms. Spiva's knowledge that the leaks began shortly after the May 28, 2019 storm—despite the fact that Defendant's witnesses agree the timing of the leaks is helpful to determine the cause of loss.[18] Plaintiff mentioned the timing of the leaks in its initial loss reporting (thus, this information was presented to Defendant),[19] but there is no evidence that this information was investigated or considered after that. A reasonable jury could find that Defendant ignored or failed to consider this information, and that it delegitimizes the conclusion that the leaks were not caused by the May 2019 hailstorm. *See McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981) ("[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case.").

---

[18] Maxwell Dep. [Doc. No. 62-4] at 99:1-22; Chynoweth Dep. [Doc. No. 62-13] at 115:5-116:23.

[19] Claim Notes [Doc. 49-3] at 10.

For all of these reasons, summary judgment on the bad faith claim is inappropriate.[20]

## B. Punitive Damages

Defendant further argues there is no evidence to support Plaintiffs' request for punitive damages.[21] Oklahoma's punitive damages statute provides for the recovery of punitive damages where the jury finds by clear and convincing evidence that the defendant acted, at a minimum, with reckless disregard for the rights of others. 23 Okla. Stat. § 9.1. The standard for reckless disregard requires a showing that Defendant was "either aware, or did not care, that there was a substantial risk that [its] conduct would cause serious injury to others" and "there must be a high probability that the conduct would cause serious harm to another person." *See* Oklahoma Uniform Jury Instruction (OUJI) No. 5.6.

"Whether that showing has been made remains an issue of law for the trial court in its role as gatekeeper to determine, upon a defendant's challenge . . . whether there is competent evidence upon which a reasonable jury could find reckless disregard, from which malice and evil intent may be inferred." *Robinson v. Sunshine Homes, Inc.*, 291 P.3d 628, 638 (Okla. Civ. App. 2010) (citing *Badillo*, 121 P.3d at 1107).

Here, Plaintiff argues Defendant acted with reckless disregard by ignoring or disregarding evidence which supported Plaintiff's claim and delaying its ultimate decision

---

[20] The Court need not address Plaintiff's additional contentions regarding delay and other aspects of Defendant's investigation because the issues of material fact discussed above preclude summary judgment.

[21] "A plea for punitive damages is generally considered to be an element of recovery of the underlying cause of action; it does not constitute a separate cause of action." *Rodebush ex rel. Rodebush v. Okla. Nursing Homes, Ltd.*, 867 P.2d 1241, 1247 (Okla. 1993).

19

on the claim for thirteen months. Resp. [Doc. No. 62] at 38. Plaintiff specifically contends Defendant refused to provide an update on the claim, despite numerous requests from Plaintiff and having available the information it ultimately relied on, all while the damage from the leaks continued to worsen. *See id*. at 9, 18, 22-24, 30-31, 38.

After viewing the evidence and drawing all reasonable inferences in Plaintiff's favor, the Court finds at this stage in the litigation that a genuine dispute exists as to whether Defendant's conduct could give rise to a finding of reckless disregard, particularly in light of the evidence Plaintiff refers to. Accordingly, summary judgment in favor of Defendant on the issue of punitive damages is unwarranted.

**V.     Conclusion**

IT IS THEREFORE ORDERED that Defendant's Motion for Partial Summary Judgment [Doc. No. 49] is DENIED.[22]

IT IS SO ORDERED this 27th day of September, 2023.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE

---

[22] Pending before the Court is Defendant's *Daubert* Motion to Exclude Testimony of R. Sean Wiley [Doc. No. 50] brought pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 759 (1993) and the Federal Rules of Evidence. Plaintiff attaches the expert opinion of Mr. Wiley to its Response. The Court's findings, however, are not reliant upon Mr. Wiley's expert opinion. The admissibility of Mr. Wiley's opinion, therefore, does not impact the results reached in this Order and will be separately addressed by the Court.